David L. Axelrod *(admitted pro hac vice)*
axelrodd@ballardspahr.com
Thomas F. Burke *(admitted pro hac vice)*
burket@ballardspahr.com
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone: 215-665-8500
Facsimile: 215-864-8999

Michael DiGiacomo (SBN 032251)
digiacomom@ballardspahr.com
1 East Washington Street, Suite 2300
Phoenix, AZ 85004
Tel.: 602.798.5400
Fax: 602.798.5595

*Attorneys for New Enterprises Ltd.*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| New Enterprises, Ltd.,<br><br>Plaintiff,<br><br>vs.<br><br>Senestech, Inc. and Roth Capital Partners, LLC,<br><br>Defendants. | NO. CV-18-08033-PCT-JAT<br><br>**FIRST AMENDED COMPLAINT**<br><br>**(Jury Trial Demanded)** |

Plaintiff New Enterprises, Ltd. ("New Enterprises"), by and through its undersigned attorneys, brings this action against SenesTech, Inc. ("SenesTech" or the "Company") and Roth Capital Partners, LLC ("Roth Capital").

**NATURE OF THE CASE**

1.      From 2015 to 2017, SenesTech—a start-up pest control company—unlawfully defrauded New Enterprises, a privately held family investment trust, for the benefit of SenesTech's insiders, including its founders, Dr. Loretta Mayer and Dr. Cheryl Dyer.

2.      First, SenesTech's senior management induced New Enterprises to invest $500,000 in the Company at a share price of $1.50 per share (based on a purported valuation of approximately $55–$60 million), while concealing that the Company had just awarded millions of stock options to SenesTech insiders at a price of $0.10 per share, and had recently been valued by an independent professional appraiser at $0.06 per share.

3.      Second, SenesTech and its underwriter Roth Capital wrongfully prevented New Enterprises from taking advantage of the SenesTech IPO and the opportunity to sell its shares at favorable post-IPO prices by unjustifiably refusing to authorize the removal of restrictions on sale accompanying the book entries for New Enterprises' shares of SenesTech stock.

4.      Later, Roth Capital—the underwriter of SenesTech's IPO—breached a "lock up" agreement with New Enterprises by promising, and failing, to allow New Enterprises to sell a portion of its SenesTech stock immediately after the IPO.

5.      Through these wrongful actions, SenesTech and Roth Capital harmed New Enterprises by fraudulently inducing it to invest in SenesTech and then preventing New Enterprises from benefitting from its investment.  New Enterprises brings this action to recover damages it suffered as a direct result of Defendants' egregious actions.

**THE PARTIES**

6.      Plaintiff New Enterprises Ltd. is a British Virgin Islands corporation with its principal place of business at 33 Moonbeam Walk, Singapore 277 243.   Subbiah Subramanian ("Subramanian") is an agent of New Enterprises.

7.      SenesTech, Inc. is a Delaware corporation with its principal place of business at 3140 N. Caden Court Suite 1, Flagstaff, AZ 86004.  The Company's common stock is traded on the NASDAQ Capital Market under the ticker symbol "SNES."  SenesTech was founded in July 2004 by Mayer and Dyer as a Nevada corporation, and reincorporated as a Delaware corporation in November 2015.  SenesTech's primary product, ContraPest, is a pest-control solution that causes infertility in rats.

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

8.    Roth Capital Partners, LLC is an investment banking firm registered as a domestic limited liability company in California and headquartered in Newport Beach, California.   The members of Roth are (1) individuals who are residents of California, Massachusetts, New Jersey, and New York, and (2) a corporation organized under the laws of the state of California with its principal place of business in California.   Roth Capital served as the underwriter and "Sole Book-Running Manager" for SenesTech's 2017 IPO. As part of SenesTech's IPO, Roth Capital prepared a prospectus for the investment, met with potential investors around the country to create excitement and interest in the IPO, and helped determine opening prices for the IPO and assess the level of interest expressed by potential investors.    Further, Roth Capital was enlisted by SenesTech to limit SenesTech's pre-IPO investors from selling their shares of SenesTech stock during the IPO.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between New Enterprises and all defendants and the amount in controversy exceeds $75,000; and pursuant to 28 U.S.C. § 1331 because the Amended Complaint alleges a violation of 15 U.S.C. § 78j(b).  This Court has supplemental jurisdiction over New Enterprises' state-law claims because they form part of the same case or controversy.  *See* 28 U.S.C. § 1367(a).

10.    Venue is proper in this Court under 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because the Defendants conduct business in this District, and committed tortious acts in this District; a substantial part of the events or omissions giving rise to the claims occurred in this District; and Defendants have purposefully availed themselves of the laws of the State of Arizona.

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

1
2
3

**FACTUAL ALLEGATIONS**

**Background**

4   11.   In early 2015, SenesTech was on the verge of financial collapse.  SenesTech

5   had no products approved for sale by the United States Environmental Protection Agency

6   ("EPA"), no revenue, and no source of financing apart from money raised from investors.

7   12.   Beginning in March 2015, SenesTech's then-Chief Executive Officer,

8   Thomas Ziemba, engaged in written and oral negotiations with New Enterprises, through

9   its agent Subramanian, to induce New Enterprises to provide SenesTech much-needed

10   capital.

11   13.   In or about mid-March 2015, at an in-person meeting at an office park in

12   Fremont, California, Ziemba orally misrepresented to Subramanian that SenesTech was

13   worth approximately $55 to $60 million, which would justify a fair market value for its

14   common stock in excess of $1.50.  Ziemba also told Subramanian that in consideration for

15   a loan, SenesTech would give, among other things, a warrant for New Enterprises to

16   purchase an equivalent amount of common stock at $1.50 per share, which Ziemba stated

17   was the current value of SenesTech's stock.  Ziemba told Subramanian that SenesTech was

18   preparing for an IPO that would allow New Enterprises to benefit financially from these

19   warrants.

20   14.   Subramanian was entitled to rely on Ziemba's statement concerning the

21   corporate valuation of SenesTech.  Ziemba, however, concealed from Subramanian that

22   SenesTech had recently hired an independent professional appraiser to undertake a

23   valuation of the Company, and that the resulting valuation placed the total value of the

24   Company at less than $2 million, and the individual shares at $0.06 each.

25   15.   On April 18, 2015, in reasonable reliance on Ziemba's misrepresentation of

26   SenesTech's corporate value, and while unaware of its falsity and the fact that SenesTech

27   had received a valuation demonstrating a much lower value, New Enterprises made a

28   secured loan of $500,000 to SenesTech (the "April 2015 Loan"), and in connection

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

therewith received a warrant permitting New Enterprises to purchase up to 346,667 shares of common stock at $1.50 per share.

16.     Between September 4, 2015 and December 15, 2015, at a time when SenesTech was unable to meet even its payroll obligations, Ziemba and others at SenesTech induced New Enterprises to make a series of four additional secured loans, totaling $500,000, to SenesTech (the "Late 2015 Loans"), all convertible by mutual agreement to common or Series B preferred SenesTech stock at $1.55 per share.  As further consideration for the Late 2015 Loans, New Enterprise received warrants for an equivalent amount of SenesTech common stock at $1.50 per share, the price that Ziemba told Subramanian represented the current value of the Company.   Without these loans, SenesTech would have been unable to remain in business.

17.     Ziemba repeated his assertion that SenesTech had a corporate valuation of approximately $55 to $60 million at other times to Subramanian, including at an in-person meeting in early to mid-October 2015 in San Jose, California.

18.     New Enterprises made all of the Late 2015 Loans in reasonable reliance on Ziemba's misrepresentation of SenesTech's corporate value, and while unaware of its falsity.

19.     In total, New Enterprises loaned $1,000,000 to SenesTech between April 18, 2015 and December 15, 2015.

**SenesTech's Undisclosed Valuation and Award of Substantial Stock Options to Insiders**

20.     Before, while, and after soliciting these loans from New Enterprises, SenesTech was devising and executing a plan to award lucrative stock options to its founders and senior executives—options predicated on a valuation low enough to generate substantial profits for the option holders after the Company's initial public offering.

21.     In March 2015, SenesTech commissioned Redwood Valuation Partners, an independent professional appraiser, to conduct a valuation analysis of the Company's common stock to determine its fair market value per share.  SenesTech commissioned that

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

5

analysis in an effort to comply with Sections 409A and 422 of the Internal Revenue Code of 1986, which require that the exercise price of incentive stock options be no less than the fair market value of the issuer's underlying shares on the date of the grant in order to avoid immediate tax consequences for the recipient individual.

22.     Redwood Valuation Partners determined that as of March 9, 2015, the fair market value of the Company's common stock was $0.06 per share, consistent with a total corporate valuation of less than $2 million (the "Redwood Valuation").

23.     Ziemba, as SenesTech's then-CEO, was aware of the Redwood Valuation when he first informed Subramanian that SenesTech had a corporate valuation of $55 million to $60 million, and at all subsequent times he repeated that statement.

24.     On July 3, 2015, at a special meeting of the SenesTech Board of Directors (the "SenesTech Board"), the SenesTech Board concluded that no new information had become available since March 9, 2015 that would materially affect the value of the Company as determined in the Redwood Valuation.  The SenesTech Board affirmed that as of that date, they still believed the Redwood Valuation was accurate.

25.     At that same meeting, on the basis of the still-valid Redwood Valuation, the Board approved an incentive plan awarding SenesTech's founders—Mayer and Dyer—1,500,000 options each, priced at an exercise price of $0.10 per share, all of which were fully vested on the date of the grant.  The SenesTech Board further gave Ziemba 2,528,466 options at an exercise price of $0.10 per share, of which 500,000 were fully vested on the date of the grant.

26.     On September 9, 2015, the SenesTech Board awarded 75,000 stock options to Thomas C. Chesterman ("Chesterman"), then a consultant for SenesTech and now its chief financial officer, at an exercise price of $0.10 per share.

27.     On October 15, 2015, the SenesTech Board awarded an additional total of 200,000 options each to Mayer and Dyer again at an exercise price of $0.10 and again fully vested on the date of the grant.

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

6

28.     On December 1, 2015, still affirming the ongoing validity of the Redwood Valuation, the SenesTech Board awarded an additional total of 600,000 options to Chesterman at an exercise price of $0.10 per share.

29.     SenesTech did not contemporaneously disclose the Redwood Valuation or the above-described stock option awards (collectively, the "2015 Option Awards") to New Enterprises.

30.     New Enterprises was at all relevant times unaware of the Redwood Valuation and the 2015 Option Awards because SenesTech purposefully concealed these facts.

31.     The Redwood Valuation and the 2015 Stock Awards reveal the false and misleading nature of Ziemba's representations that SenesTech was worth approximately $55 million to $60 million.  Ziemba and others at SenesTech knew that if they had told New Enterprises the truth about the Redwood Valuation, New Enterprises would have known how little the Company was worth and how close it was to completely failing, and would not have loaned SenesTech any money.

**SenesTech Fraudulently Induces Equity Investments by New Enterprises**

32.     In December 2015, Chesterman (by then SenesTech's new Chief Financial Officer) and Grover Wickersham (the recently elected Vice-Chairman of the SenesTech Board) urged Subramanian by email and by telephone to cancel the April 2015 Loan in exchange for SenesTech stock under the April 2015 warrant, and convert the Late 2015 Loans to SenesTech stock.  Chesterman and Wickersham, like Ziemba, failed to disclose the Redwood Valuation and 2015 Stock Awards because they knew that if New Enterprises was aware of the Company's true valuation, it would have elected to keep its secured loans rather than become an equity stakeholder in SenesTech.

33.     On December 31, 2015, while still unaware of the Redwood Valuation and the 2015 Stock Awards, New Enterprises exercised its contractual right to convert the Late 2015 Loans to 333,255 shares of Series B preferred voting stock at $1.55 per share.

34.     Ziemba's false and misleading April 2015 representation regarding SenesTech's value and SenesTech's failure to disclose the Redwood Valuation and the

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

7

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

2015 Option Awards were material to New Enterprises' decisions both to loan SenesTech money in exchange for warrants and then to convert the Late 2015 Loans, because New Enterprises reasonably believed it was investing in a company worth $55 to $60 million. In fact, however, the Company was actually valued at between $0.06 per share (based on the Redwood Valuation) and $0.10 per share (based on its December 2015 stock option award to Chesterman).

35.     But for Ziemba's representation that SenesTech was worth approximately $55 to $60 million, and his (and SenesTech's) failure to disclose the Redwood Valuation and the 2015 Option Awards, New Enterprises—like any reasonable investor—would not have converted the Late 2015 Loans to SenesTech stock at $1.55 per share because that conversion rate was greatly in excess of the fair market value of SenesTech stock as determined by an independent professional appraiser and affirmed by the SenesTech Board's issuance of options in December 2015 at that same price.

36.     Between April 8, 2016 and May 6, 2016, SenesTech offered holders of SenesTech stock the opportunity to purchase additional shares of common stock at $0.50 per share (the "Rights Offering").

37.     During that Rights Offering, while still unaware of the Redwood Valuation and the 2015 Option Awards, New Enterprises agreed to cancel the April 2015 Loan in exchange for approximately 1,021,800 shares of common stock at $0.50 per share.  New Enterprises also purchased an additional 300,000 shares of common stock during the Rights Offering, bringing New Enterprises' total holdings of SenesTech stock to approximately 1,655,055 shares.

38.     Ziemba's false and misleading April 2015 representation regarding SenesTech's value and SenesTech's failure to disclose the Redwood Valuation and the 2015 Option Awards were material to New Enterprises' decision to exchange the April Loan for equity because New Enterprises believed it was investing in a company worth $55 to $60 million.  In fact, however, the company was actually valued at between $0.06

per share (based on the Redwood Valuation) and $0.10 per share (based on its December 2015 stock option award to Chesterman).

39.     But for Ziemba's representation that SenesTech was worth approximately $55 to $60 million, and his (and SenesTech's) failure to disclose the Redwood Valuation and the 2015 Option Awards, New Enterprises—like any reasonable investor—would not have exchanged the April 2015 Loan for equity in SenesTech stock at $0.50 per share because that conversion rate was greatly in excess of the fair market value of SenesTech stock as determined by an independent professional appraiser and affirmed by the SenesTech Board's issuance of options in December 2015 at that same price..

**The Reverse Stock Split**

40.     In September 2016, the SenesTech Board approved a reverse stock split at a ratio of 5 to 1, to take effect simultaneously with the Company's contemplated initial public offering (IPO).

41.     The effect of the reverse stock split was that the approximately 1,655,055 shares owned by New Enterprises, acquired at a weighted average basis of approximately $0.69 per share, were converted at the time of the IPO to approximately 331,011 shares, acquired at a weighted average basis of $3.45 per share.

42.     At all relevant times, all SenesTech stock owned by New Enterprises has been maintained in uncertificated "book entry" form, such that no physical stock certificates exist.

43.     Until at least May 2017, all of the book entries for New Enterprises' uncertificated SenesTech stock were subject to a restriction stating the securities at issue had not been registered and could not be sold or otherwise transferred or assigned until either the securities became registered, or SenesTech received a satisfactory opinion of counsel stating that such registration is not required for sale or transfer.

**SenesTech and Roth Capital Block New Enterprises From Benefiting from the**

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

**SenesTech IPO**

44.     In October 2016, SenesTech began preparations for an initial public offering ("IPO"), underwritten principally by Roth Capital.  Pursuant to the IPO, SenesTech planned to issues shares of common stock at approximately $12 to $14 per share (post-reverse split).

45.     New Enterprises sought to take advantage of the IPO and sell its shares of SenesTech stock on the open market.  For a seller of restricted securities of a private issuer who is unaffiliated with the issuer, as New Enterprises was, applicable securities law typically require the seller to hold the securities for a period of one year before such shares would be eligible for sale.  *See* 17 C.F.R. § 230.144(b)(1)(i) (also known as "Rule 144").

46.     Rule 144(d)(3)(ii), however, allows a seller to satisfy the one-year holding requirement through a process known as "tacking": "If the securities [at issue] were acquired from the issuer solely in exchange for other securities of the same issuer, the newly acquired securities shall be deemed to have been acquired at the same time as the securities surrendered for conversion or exchange, even if the securities surrendered were not convertible or exchangeable by their terms."  17 C.F.R. § 230.144(d)(3)(ii).

47.     Beginning on November 1, 2017, counsel for New Enterprises, an experienced and reputable securities-law practitioner, communicated to counsel for SenesTech that New Enterprises wished to remove the restriction on sale or transfer from 859,133 pre-reverse-split shares of SenesTech stock held by New Enterprises under book entry 1393.  Subramanian communicated that desire to Chesterman, SenesTech's CFO, under separate cover.

48.     On November 7, 2016, counsel for New Enterprises provided a signed opinion letter (the "November Opinion Letter") to SenesTech and its transfer agent stating that 859,133 pre-reverse-split shares of SenesTech stock held by New Enterprises under book entry 1393 could be sold (or reissued without the aforementioned restriction) without registration because, among other things, New Enterprises "has been the beneficial owner

10

of the Shares for more than one year prior to the date hereof calculated in accordance with Rule 144(d)."

49.     The November Opinion Letter constituted an accurate statement of New Enterprises' legal rights with respect to its ability to sell or transfer its SenesTech stock, as issued by an experienced and reputable securities-law practitioner.   SenesTech was therefore obligated to conclude that the opinion letter was a "satisfactory opinion of counsel" for purposes of the restriction on SenesTech's stock.

50.     Specifically, the 859,133 shares of SenesTech stock at issue were obtained by New Enterprises as a result of its cancellation of the April 2015 Loan in exchange for equity during the May 2016 Rights Offering.  Under Rule 144(d), because the April 2015 Loan was cancelled "solely in exchange for other securities of the same issuer," such shares "shall be deemed to have been acquired" as of April 2015.  Therefore, with the application of tacking, New Enterprises had held the securities at issue for in excess of the one-year holding requirement for sale or transfer.

51.     Later on November 7, 2016, counsel for SenesTech informed New Enterprises that "Roth has said they will not permit any delegending of shares at this late stage in the [IPO] process.  Accordingly, the Company cannot process the delegending request at this time."  Thus, SenesTech was informing New Enterprises that the validity of New Enterprises' opinion letter was irrelevant because Roth Capital—which had an interest in inhibiting pre-ICO investors from creating additional supply of SenesTech shares during the IPO—had categorically instructed SenesTech not to remove any restrictions on sale, and SenesTech intended to adhere to Roth Capital's demand.

52.     In response, also that day, counsel for New Enterprises wrote to SenesTech:

> It is really not up to Roth as to whether the legend gets removed or not. . . .  My client has a property right in the securities at issue and by refusing to take the restriction off the shares you are depriving my client of its property right and ability to transfer the shares even though he may do so legally.

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

53.    SenesTech persisted in its refusal to provide an instruction letter to its transfer agent to remove the restriction based on the November Opinion Letter, and as a result blocked New Enterprises from benefiting from the SenesTech IPO.

**Roth Capital Induces New Enterprises to "Lock-Up" its SenesTech Stock**

54.    Shortly after SenesTech refused to remove the restriction from New Enterprises' shares, a managing director of Roth Capital contacted Subramanian and requested that New Enterprises, ostensibly along with other investors, agree to a 180-day post-IPO "lock-up" on the sale of its SenesTech shares.  Roth Capital said that under this "lock-up," New Enterprises would be prohibited from selling its SenesTech stock for 180 days following the IPO without the prior written consent of Roth Capital.

55.    When Subramanian refused and told Roth Capital that New Enterprises intended to liquidate its SenesTech holdings at the earliest possible opportunity, Roth Capital responded that New Enterprises' sale of its SenesTech stock would jeopardize the IPO and the current and future value of New Enterprises' holdings.  Roth Capital offered New Enterprises this deal: in exchange for New Enterprises' agreement to a 180-day post-IPO lock-up, Roth Capital would exempt 50,000 post-reverse-split shares held by New Enterprises from the lock-up, such that New Enterprises could sell those shares right after the IPO, well before the expiration of 180 days; and Roth Capital would permit New Enterprises to sell its remaining shares in late December 2016 or January 2017; and Roth Capital and SenesTech management would help New Enterprises find buyers for its shares.

56.    Roth Capital knew that its offer to "exempt" 50,000 shares from the lock-up meant that Roth Capital would allow the restriction on sale to be removed from those shares (an approval it had previously refused to give), such that New Enterprises could sell them immediately during the IPO.

57.    New Enterprises reasonably understood that Roth Capital had the authority to cause the restriction on sale to be removed because of its previous correspondence with SenesTech regarding removal of the restriction.

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

58.     Further, the Form S-1 filed with the SEC by SenesTech in advance of its initial public offering stated: "Roth Capital Partners may, **in its sole discretion,** at any time or from time to time and without notice, release for sale in the public market all or any portion of the shares restricted by the terms of the lock-up agreements." (emphasis added).

59.     Later in November 2016, Grover Wickersham, then Vice-Chair of the SenesTech Board, contacted Subramanian and urged him to agree to the lock-up, and told Subramanian that the SenesTech IPO would fail unless New Enterprises agreed to the lock-up.

60.     On or about November 13, 2016, Subramanian, on behalf of New Enterprises, agreed to Roth Capital's lock-up proposal (the "Lock-Up Agreement").

61.     Afterward, Wickersham emailed Subramanian, copying Mayer and Chesterman, to state: "Once again, you've come through for the team when the chips were down.  Don't think for a second it isn't greatly appreciated!"  Mayer emailed Subramanian separately to state: "Thank you Subbiah.  All I can say is live to fight another day."  New Enterprises thus had reason to reason to believe that SenesTech and Roth Capital would not continue to frustrate its efforts to sell its shares of SenesTech stock.

**The Initial Public Offering**

62.     On December 8, 2016, SenesTech held an IPO of common stock at a price of $8 per share.

63.     In December 2016, Subramanian contacted Roth Capital, and then SenesTech, for purposes of securing removal of the restriction on sale for the 50,000 post-reverse-split shares that had been carved out of the Lock-Up Agreement.

64.     Roth Capital refused to authorize SenesTech to remove the restriction on sale for the 50,000 shares, rendering impossible the short-term sale of any shares owned by New Enterprises.  SenesTech likewise refused to remove the restriction on sale without a new opinion letter from counsel.

65.     On January 17, 2017, SenesTech's shares traded at an all-time high of $10.68 per share.

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

66.    As of January 17, 2017, New Enterprises was unable to sell any of its approximately 331,011 post-reverse-split shares of SenesTech stock, which at that could have been sold for an all-time high of approximately $3.52 million.

67.    On April 18, 2017, New Enterprises presented SenesTech with a second final opinion letter stating that registration of the SenesTech securities held by New Enterprises was not required for sale or transfer.

68.    On May 4, 2017, SenesTech's transfer agent finally reissued, without the aforementioned restriction, 50,000 shares of SenesTech held by New Enterprises.  By that time, SenesTech's stock price at closing had fallen to approximately $6.58.

69.    By June 13, 2017, when SenesTech authorized the removal of the legend from New Enterprises' remaining 281,011 shares, the Company's stock price at closing was $6.21.

70.    New Enterprises has since sold most of its shares of SenesTech stock at prices substantially below the post-IPO high and below its per-share acquisition cost, leading to a net loss as a result of its acquisition and sale of SenesTech stock.

**COUNT I**
**Common Law Fraud**
**(SenesTech)**

71.    New Enterprises incorporates all of the above paragraphs as though fully set forth herein.

72.    Under Arizona law, a successful fraud claim requires proof of nine elements: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it be acted upon by the recipient in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely on it; (9) the hearer's consequent and proximate injury.

*Comerica Bank v. Mahmoodi*, 229 P.3d 1031, 1033-34 (Ariz. Ct. App. 2010) (citation omitted).

73.    Thomas Ziemba, acting in his capacity as then-CEO of SenesTech, knowingly made material false misrepresentations concerning the corporate valuation of

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

SenesTech to Subbiah Subramanian, the agent of New Enterprises, with the intent that New Enterprises would rely on that misrepresentation for purposes of lending funds to SenesTech.

74.     New Enterprises was unaware of the falsity of Ziemba's misrepresentations concerning the corporate valuation of SenesTech and reasonably relied on those misrepresentations when it made the April 2015 Loan and Late 2015 Loans to SenesTech, and when it exchanged and converted those loans into SenesTech stock.

75.     Further, at all relevant times, SenesTech knowingly failed to disclose the Redwood Valuation and the 2015 Option Awards with the intent that New Enterprises would initially rely, and continue to rely, on Ziemba's misrepresentations as to SenesTech's corporate value for purposes of lending funds to SenesTech and exchanging and converting its loans into SenesTech stock.  Ziemba and others at SenesTech knew that had they told New Enterprises the truth about the Company's valuation, New Enterprises would not have loaned the Company the money it needed to stay afloat.

76.     SenesTech's intentional deception constitutes common-law fraud predicated upon outrageous bad-faith conduct for which New Enterprises is entitled to punitive damages.

77.     Accordingly, New Enterprises is entitled to damages in an amount to be determined at trial.

## COUNT II
## Securities Fraud – Federal Law

### (SenesTech)

78.     New Enterprises incorporates all of the above paragraphs as though fully set forth herein.

79.     Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, makes it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

15

a)   To employ any device, scheme, or artifice to defraud,

b)   To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

c)   To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

80.    Plaintiffs asserting a securities fraud claim under Rule 10b-5 must adequately allege six elements: (1) a material misrepresentation or omission by the defendants; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1206 (9th Cir. 2016) (citing *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011)).

81.    SenesTech, acting with intent to defraud, made material misrepresentations and omitted material facts in connection with New Enterprises' acquisition of securities issued by SenesTech.  Specifically, SenesTech misrepresented that its corporate value as of April 2015 was $55 million to $60 million, and omitted from its disclosures the Redwood Valuation and the 2015 Option Awards.  Ziemba and others at SenesTech knew that had they told New Enterprises the truth about the Company's valuation, New Enterprises would not have loaned the Company the money it needed to stay afloat.

82.    New Enterprises reasonably relied on those misrepresentations and omissions when it exchanged and converted the April 2015 Loan and Late 2015 Loans into SenesTech stock.

83.    New Enterprises suffered an economic loss caused by SenesTech's misrepresentations and omissions because in the absence of SenesTech's misrepresentations and omissions, New Enterprises would not have made the April 2015 Loan or Late 2015 Loans in exchange for warrants for SenesTech stock, and would not

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

16

have exchanged or converted those loans into SenesTech stock or later sold that stock at a loss.

84.     Accordingly, New Enterprises is entitled to damages in an amount to be determined at trial.

**COUNT III**
**Securities Fraud – State Law**
**(SenesTech)**

85.     New Enterprises incorporates all of the above paragraphs as though fully set forth herein.

86.     A.R.S. § 44-1991 makes it a fraudulent and unlawful for any person, in connection with a transaction or transactions within or from Arizona involving an offer to sell or buy securities, or a sale or purchase of securities, directly or indirectly, to:

    a)    Employ any device, scheme or artifice to defraud,

    b)    Make any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

    c)    Engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit

87.     The elements of a securities fraud claim under the Arizona Securities Act, Arizona Revised Statute § 44-1991(A), are "almost identical" to its federal counterpart. Ariz. Rev. Stat. § 44-1991(A)(2) (stating that it is a fraud to "[m]ake any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading"); *Grand v. Nacchio*, 236 P.3d 398, 400 (2010) (equating the federal and state law elements).

88.     SenesTech, acting with intent to defraud, made material misrepresentations and omitted material facts in connection with New Enterprises' acquisition of securities issued by SenesTech.  Specifically, SenesTech misrepresented that its corporate value as of April 2015 was $55 million to $60 million, and omitted from its disclosures the Redwood Valuation and the 2015 Option Awards.  Ziemba and others at SenesTech knew

17

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

that had they told New Enterprises the truth about the Company's valuation, New Enterprises would not have loaned the Company the money it needed to stay afloat.

89.     New Enterprises reasonably relied on those misrepresentations and omissions when it exchanged and converted the April 2015 Loan and Late 2015 Loans into SenesTech stock.

90.     New Enterprises suffered an economic loss caused by SenesTech's misrepresentations and omissions because in the absence of SenesTech's misrepresentations and omissions, New Enterprises would not have made the April 2015 Loan or Late 2015 Loans in exchange for warrants for SenesTech stock, and would not have exchanged or converted those loans into SenesTech stock or later sold that stock at a loss.

91.     Accordingly, New Enterprises is entitled to damages in an amount to be determined at trial.

<u>**COUNT IV**</u>
<u>**Violation of Delaware Law**</u>

<u>**(SenesTech)**</u>

92.     New Enterprises incorporates all of the above paragraphs as if set forth fully herein.

93.     Delaware Code § 8-401 provides that if "an instruction is presented to an issuer with a request to register transfer of an uncertificated security, the issuer shall register the transfer as requested if:

(1)  under the terms of the security the person seeking registration of transfer is eligible to have the security registered in its name;

(2)  the endorsement or instruction is made by the appropriate person or by an agent who has actual authority to act on behalf of the appropriate person;

(3)  reasonable assurance is given that the endorsement or instruction is genuine and authorized (Section 8-402);

(4)  any applicable law relating to the collection of taxes has been complied with;

(5)  the transfer does not violate any restriction on transfer imposed by the issuer in accordance with Section 8-204;

(6)  a demand that the issuer not register transfer has not become effective under Section 8-403, or the issuer has complied with Section 8-403(b) but

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

no legal process or indemnity bond is obtained as provided in Section 8-403(d); and

(7)  the transfer is in fact rightful or is to a protected purchaser.

Del. Code § 8-401(a).  "If an issuer is under a duty to register a transfer of a security, the issuer is liable to a person presenting . . . an instruction for registration . . . for loss resulting from unreasonable delay in registration or failure or refusal to register the transfer."  *Id.* § 8-401(b).

94.    Beginning on November 1, 2017, counsel for New Enterprises communicated to counsel for SenesTech that New Enterprises wished to remove the restriction on sale or transfer from 859,133 pre-reverse-split shares of SenesTech stock held by New Enterprises under book entry 1393.  Subramanian communicated that desire to Chesterman, SenesTech's CFO, under separate cover.

95.    On November 7, 2016, counsel for New Enterprises provided the November Opinion Letter to SenesTech and its transfer agent stating that 859,133 pre-reverse-split shares of SenesTech stock held by New Enterprises under book entry 1393 could be sold (or reissued without the aforementioned restriction) without registration because, among other things, New Enterprises "has been the beneficial owner of the Shares for more than one year prior to the date hereof calculated in accordance with Rule 144(d)."

96.    The November Opinion Letter constituted an accurate statement of New Enterprises' legal rights with respect to its ability to sell or transfer its SenesTech stock, as issued by an experienced and reputable securities-law practitioner.  SenesTech therefore should have found the opinion letter to be a "satisfactory opinion of counsel" for purposes of the restriction on SenesTech's stock.

97.    New Enterprises has satisfied all other prerequisites of Section 8-401(a), including that:

        a)    Under the terms of the book entry for the SenesTech stock at issue, New Enterprises was eligible to have the stock registered in its name.

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

b)   The instruction was made by an appropriate person, i.e., an agent of New Enterprises with actual authority to act on behalf of New Enterprises;

c)   Reasonable assurances were given that the instruction was genuine and authorized (Section 8-402);

d)   No applicable law required collection of taxes, and thus all applicable laws requiring collection of taxes were complied with;

e)   The transfer did not violate any restriction on transfer imposed by SenesTech in accordance with Section 8-204, because SenesTech had provided a satisfactory opinion of counsel as described above;

f)   No demand was made that SenesTech not register transfer under Section 8-403; and

g)   the transfer was in fact rightful because SenesTech had provided a satisfactory opinion of counsel as described above.

98.    As a result, SenesTech was under a duty to register transfer as instructed by New Enterprises.

99.    SenesTech breached its duty to register transfer by intentionally and unreasonably delaying in instructing its transfer agent to remove the restriction from the book entry pertaining to approximately 859,133 pre-reverse-split shares of SenesTech stock.

100.    SenesTech's breach of its duty to register transfer caused a loss to New Enterprises because New Enterprises, rather than being able to sell its 859,133 shares of SenesTech stock at a post-IPO high of $10.68, was unable to sell those shares until June 2017 or later, at which time SenesTech stock was trading at or substantially below $6.50.

101.    Accordingly, New Enterprises is entitled to damages in an amount to be determined at trial.

**COUNT V**
**Breach of Contract**
**(SenesTech)**

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

20

102.    New Enterprises incorporates all of the above paragraphs as if set forth fully herein.

103.    In order to state a claim for breach of contract under Arizona law, a plaintiff must allege: "(1) the existence of a contract; (2) breach; and (3) resulting damages." *First Am. Title Ins. Co. v. Johnson Bank*, 372 P.3d 292, 297 (Ariz. 2016).

104.    The stock issued by SenesTech and owned by New Enterprises are valid and enforceable contracts.

105.    All of the uncertificated SenesTech stock owned by New Enterprises carried a restriction accompanying the relevant book entries stating the securities at issue had not been registered and could not be sold or otherwise transferred or assigned until either the securities became registered, or SenesTech received a satisfactory opinion of counsel stating that such registration is not required for sale or transfer.

106.    Beginning on November 1, 2017, counsel for New Enterprises communicated to counsel for SenesTech that New Enterprises wished to remove the restriction on sale or transfer from 859,133 pre-reverse-split shares of SenesTech stock held by New Enterprises under book entry 1393.  Subramanian communicated that desire to Chesterman, SenesTech's CFO, under separate cover.

107.    On November 7, 2016, counsel for New Enterprises provided the November Opinion Letter to SenesTech and its transfer agent stating that 859,133 pre-reverse-split shares of SenesTech stock held by New Enterprises under book entry 1393 could be sold (or reissued without the aforementioned restriction) without registration because, among other things, New Enterprises "has been the beneficial owner of the Shares for more than one year prior to the date hereof calculated in accordance with Rule 144(d)."

108.    The November Opinion Letter constituted an accurate statement of New Enterprises' legal rights with respect to its ability to sell or transfer its SenesTech stock, as issued by an experienced and reputable securities-law practitioner.  SenesTech therefore should have found the opinion letter to be a "satisfactory opinion of counsel" for purposes of the restriction on SenesTech's stock.

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

109.   SenesTech breached the terms of the stock restriction by failing to timely instruct its transfer agent to remove the restriction from the book entry pertaining to approximately 859,133 pre-reverse-split shares of SenesTech stock.

110.   New Enterprises has performed all of its obligations arising from its ownership of the stock.

111.   SenesTech's breach of its contractual duty to timely instruct its transfer agent to remove the restriction caused a loss to New Enterprises because New Enterprises, rather than being able to sell its 859,133 shares of SenesTech stock at a post-IPO high of $10.68, was unable to sell those shares until June 2017 or later, at which time SenesTech stock was trading at or substantially below $6.50.

## COUNT VI
### Tortious Interference with Prospective Business Advantage

### (All Defendants)

112.   New Enterprises incorporates all of the above paragraphs as if set forth fully herein.

113.   In order to state a claim for tortious interference under Arizona law, a plaintiff must allege: "(1) the existence of a valid business expectancy; (2) the interferer's knowledge of the business expectancy; (3) the interferer intentionally induced or caused termination of the business expectancy; and (4) damage suffered as a result of termination of the business expectancy." *Dube v. Likins*, 167 P.3d 93, 99 (Ariz. Ct. App. 2007).

114.   New Enterprises had a valid business expectancy that it would be able to sell its shares of SenesTech stock upon removal of the restrictive legend because a reasonable and foreseeable result of SenesTech's initial public offering in December 2017 was that an active market would exist for the purchase and sale of SenesTech stock.

115.   SenesTech and Roth Capital were aware that New Enterprises had a valid business expectancy in the sale of its SenesTech stock based on communications throughout November 2017 between Subramanian and SenesTech employees and a managing director of Roth Capital.

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

116.   As detailed above, SenesTech, at Roth Capital's instruction, intentionally and unreasonably delayed in instructing its transfer agent to remove the restriction accompanying the book entry of SenesTech stock owned by New Enterprises, which had the effect of terminating New Enterprises' business expectancy.

117.   SenesTech's intentional and unreasonable delay in that regard was wrongful because it constituted both a violation of Delaware law and a breach of contract.  Roth Capital's instruction for SenesTech to refuse New Enterprises' request to remove the restriction on sale, which constituted a violation of Delaware law and a breach of contract, was likewise wrongful.

118.   Had SenesTech not intentionally and unreasonably delayed in instructing its transfer agent to remove the restriction, a reasonable probability exists that New Enterprises would have been able to sell its SenesTech stock at a higher share price than it ultimately received.

119.   As a result of these wrongful acts, SenesTech and Roth Capital tortiously interfered with New Enterprises' prospective business advantage with respect to the sale of 859,133 shares of SenesTech stock.

120.   Accordingly, New Enterprises is entitled to damages in an amount to be determined at trial.

**COUNT VII**
**Conversion**

**(All Defendants)**

121.   New Enterprises incorporates all of the above paragraphs as if set forth fully herein.

122.   Conversion under Arizona law is "the act of wrongful dominion or control over personal property in denial of or inconsistent with the rights of another." *Case Corp. v. Gehrke*, 91 P.3d 362, 365 (Ariz. Ct. App. 2004) (citation omitted). "To maintain such an action, the plaintiff must have the right to immediate possession of the property at the time of the conversion." *Id.*

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

23

123.   As detailed above, SenesTech, at Roth Capital's instruction, intentionally and unreasonably delayed in instructing its transfer agent to remove the restriction accompanying the book entry of SenesTech stock owned by New Enterprises.

124.   SenesTech's intentional and unreasonable delay, which constituted both a violation of Delaware law and a breach of contract, was an act of wrongful dominion or control over New Enterprises' personal property, i.e., its shares of SenesTech stock. Roth Capital's instruction for SenesTech to refuse New Enterprises' request to remove the restriction on sale, which constituted a violation of Delaware law and a breach of contract, was likewise an act of wrongful dominion or control over New Enterprises' personal property.

125.   As a result of these wrongful acts, SenesTech and Roth Capital converted approximately 859,133 pre-reverse-split shares of SenesTech stock that were the property of New Enterprises.

126.   Accordingly, New Enterprises is entitled to damages in an amount to be determined at trial.

## COUNT VIII
## Breach of Contract
## (Roth Capital)

127.   New Enterprises incorporates all of the above paragraphs as if set forth fully herein.

128.   Under California law, "[t]he standard elements of a claim for breach of contract are: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff therefrom." *Wall Street Network, Ltd. v. N. Y. Times Co.*, 80 Cal. Rptr. 3d 6, 12 (Cal. Ct. App. 2008); see also Cal. Civ. Code § 1550.

129.   On or about November 13, 2016, Roth Capital entered into an agreement with New Enterprises under which New Enterprises agreed to a 180-day post-IPO lock-up of its shares of SenesTech.

130.   In exchange, Roth Capital promised that it would exempt 50,000 post-reverse-split shares held by New Enterprises from the lock-up, such that New Enterprises

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

24

could sell such shares in the weeks after the IPO and give its permission for New Enterprises to sell such shares in the weeks after the IPO, well before the expiration of 180 days.

131.    Roth Capital further committed that it would give its permission for New Enterprises to sell its remaining shares by January 2017, and that Roth Capital and SenesTech management would help New Enterprises find buyers for such shares at that time.

132.    The November 13, 2016 Lock-Up Agreement between Roth Capital and New Enterprises is a valid and enforceable contract which provides that it "shall be governed" by California law.

133.    In December 2016, Subramanian contacted Roth Capital, and then SenesTech, for purposes of securing removal of the restriction on sale for the 50,000 post-reverse-split shares that had been carved out of the Lock-Up Agreement.

134.    Roth Capital refused to authorize SenesTech to remove the restriction on sale for the 50,000 shares, rendering impossible the short-term sale of any shares owned by New Enterprises.

135.    As demonstrated by SenesTech's email of November 7, 2016, Roth Capital had actual authority to instruct New Enterprises with respect to removal of the restriction on sale.

136.    Further, the Form S-1 filed with the SEC by SenesTech in advance of its initial public offering stated: "Roth Capital Partners may, **in its sole discretion,** at any time or from time to time and without notice, release for sale in the public market all or any portion of the shares restricted by the terms of the lock-up agreements." (emphasis added).

137.    Roth Capital breached its contract with New Enterprises by failing to authorize SenesTech to remove the restriction on sale for the 50,000 shares, rendering impossible the short-term sale of any shares owned by New Enterprises.

138.    New Enterprises has performed all of its obligations under the November 13, 2016 agreement.

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

139.   As a result of the above-described breach, New Enterprises has suffered, and continues to suffer, injury.

## **PRAYER FOR RELIEF**

WHEREFORE, New Enterprises respectfully demands judgment in its favor and against the defendants as follows:

    a)   Awarding New Enterprises monetary damages, including compensatory damages, punitive damages, and attorney's fees, in an amount to be determined at trial, as well as pre-judgment and post-judgment interest at the maximum rate allowed by law; and

    b)   Awarding such other and further legal and equitable relief as this Court deems just and proper.

## **JURY DEMAND**

New Enterprises demands a trial by jury on all claims so triable as a matter of right.

RESPECTFULLY SUBMITTED this 25th day of January, 2019.

BALLARD SPAHR LLP


By: /s/ Michael DiGiacomo
    David L. Axelrod *(admitted pro hac vice)*
    axelrodd@ballardspahr.com
    Thomas F. Burke *(admitted pro hac vice)*
    burket@ballardspahr.com
    1735 Market Street, 51st Floor
    Philadelphia, PA  19103-7599
    Telephone: 215.665.8500
    Facsimile: 215.864.8999

    Michael DiGiacomo (SBN 032251)
    digiacomom@ballardspahr.com
    1 East Washington Street, Suite 2300
    Phoenix, AZ 85004
    Tel.: 602.798.5400
    Fax: 602.798.5595

    *Attorneys for New Enterprises Ltd.*

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555